[Cite as *State v. Williams*, 2021-Ohio-241.]

IN THE COURT OF APPEALS

ELEVENTH APPELLATE DISTRICT

TRUMBULL COUNTY, OHIO

STATE OF OHIO, : **O P I N I O N**

Plaintiff-Appellee, :

- vs - : **CASE NO. 2019-T-0028**

ANDRE R. WILLIAMS, :

Defendant-Appellant. :

Civil Appeal from the Trumbull County Court of Common Pleas.
Case No. 1988 CR 00365.

Judgment: Reversed and remanded.

*Dennis Watkins*, Trumbull County Prosecutor; *Diane Barber* & *Ashleigh Musick*, Assistant Prosecutors, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481-1092 (For Plaintiff-Appellee).

*Stephen C. Newman*, Federal Public Defender; *Alan C. Rossman* & *Jillian S. Davis*, Office of the Federal Public Defender, Capital Habeas Unit, Skylight Office Tower, 1660 West Second Street, Suite 750, Cleveland, OH 44113 (For Defendant-Appellant).

TIMOTHY P. CANNON, J.

{¶1} Andre R. Williams, an offender on Ohio's death row, appeals from the April 11, 2019 judgment of the Trumbull County Court of Common Pleas, denying Williams' petition for postconviction relief. Pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), Williams claims he is intellectually disabled and challenges imposition of the death penalty against him as cruel and unusual punishment in violation of the Eighth Amendment to the

United States Constitution. The judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion.

**Relevant Procedural History**

{¶2} Williams and a co-defendant were charged with the home invasion and murder of George Melnick and the attempted murder of Katherine Melnick. Williams was additionally charged with the rape of Katherine Melnick. In 1989, a jury found Williams guilty of three counts of aggravated murder and four death penalty specifications for each count; attempted aggravated murder; aggravated burglary; aggravated robbery; and the lesser included offense of attempted rape. During the penalty phase, the prosecution moved to dismiss two of the aggravated murder charges. The jury unanimously recommended a sentence of death on the remaining count of aggravated murder based on the underlying felony of aggravated burglary. The Trumbull County Court of Common Pleas sentenced Williams to the death penalty and prison terms. The Supreme Court of Ohio upheld Williams' convictions and death sentence in *State v. Williams*, 74 Ohio St.3d 569 (1996).

{¶3} Williams' initial claim for habeas relief from the federal courts was filed in 1999. Subsequent to the denial of his habeas petition, the United States Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002). *Atkins* stands for the proposition that the execution of an intellectually disabled criminal is "cruel and unusual punishment" prohibited by the Eighth Amendment to the United States Constitution. *Id.* at syllabus.

{¶4} Following *Atkins*, the Supreme Court of Ohio developed procedures and substantive standards for resolving claims of intellectual disability in the context of death penalty cases ("*Atkins* claims"). *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625. The

2

Court set forth a three-part test for intellectual disability (the "*Lott* Test"): (1) significantly subaverage intellectual functioning; (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction; and (3) onset before the age of 18. *Id.* at ¶12. The *Lott* Court further held that IQ tests alone "are not sufficient to make a final determination" on the issue and that "there is a rebuttable presumption that a defendant is not [intellectually disabled][1] if his or her IQ is above 70." *Id.*

{¶5} In 2003, Williams filed an *Atkins* claim with the Trumbull County Court of Common Pleas via a petition for postconviction relief. On October 19, 2004, the trial court granted summary judgment to the state of Ohio and dismissed Williams' petition without hearing. The trial court found Williams failed to meet his burden to submit evidentiary documents containing sufficient operative facts to demonstrate intellectual disability because (1) his expert witness had reported Williams obtained a full scale IQ of 75, which did not meet the criteria based upon the *Lott* definition; and (2) the evidence revealed no deficiencies in adaptive skills. On appeal, this court reversed the trial court's judgment and remanded the matter for the trial court to address the issues of dismissal and summary judgment separately and to enter a new judgment on Williams' petition. *State v. Williams*, 165 Ohio App.3d 594, 2006-Ohio-617, ¶21 (11th Dist.), *appeal not accepted*, 110 Ohio St.3d 1410 (2006).

{¶6} On remand, the trial court issued a revised entry granting summary judgment to the state without holding a hearing and without any new testing of Williams. This court affirmed the trial court's judgment. We held that "[t]he only criterion for which Williams met his burden [to raise a genuine issue of material fact] is the third criterion.

---

1. Until relatively recently, "intellectual disability" was nominally referred to as "mental retardation."

3

The evidence before the court does demonstrate that Williams had indications of [intellectual disability] before the age of 18." *State v. Williams*, 11th Dist. Trumbull No. 2007-T-0105, 2008-Ohio-3257, ¶34, *appeal not accepted*, 120 Ohio St.3d 1453 (2008). Unlike the trial court, we credited Williams' school and psychological records, which included the school psychologists' description of "educable mentally retarded"; a full scale IQ score of 67 from the age of nearly 16; and an evaluation that determined Williams' adaptive behavior functioning was several years behind his actual age in areas of communication and self-direction. *Id.* We rejected this evidence, however, in assessing whether Williams satisfied the first two *Lott* factors because it did "not constitute competent evidence from which inferences may be made regarding his *present* mental capacity." *Id.* at ¶37 (emphasis added).

{¶7} In 2009, Williams filed an *Atkins* claim in the federal district court via a petition for habeas corpus. The district court held that, because we had determined Williams satisfied the "age of onset" criterion, it needed only review our factual determinations regarding the other two criteria. The district court held our factual determinations that Williams failed to demonstrate "significant subaverage intellectual functioning" and "adaptive skills deficits" was not unreasonable in light of the evidence presented. *Williams v. Mitchell*, N.D.Ohio No. 1:09 CV 2246, 2012 WL 4505774, *38 (Sept. 28, 2012).

{¶8} The U.S. Sixth Circuit Court of Appeals vacated the district court's decision, finding this court's decision was contrary to clearly established federal law for a number of reasons. *Williams v. Mitchell*, 792 F.3d 606 (6th Cir.2015).

4

{¶9} First, the Sixth Circuit criticized our "wholesale exclusion" of past evidence of intellectual disability in determining whether Williams has significantly subaverage mental functioning and adaptive skills limitations as "opposite" and "directly contrary" to clearly established Federal law set forth in *Atkins*: "notwithstanding the *Lott* court holding that past evidence of intellectual functioning (*e.g.*, past IQ scores, evidence of adaptive limitations from 'early-life') was relevant to the three *Atkins* factors, the court of appeals rejected outright any pre-1989 evidence from its analysis of Williams's intellectual functioning and adaptive skills, despite finding this same evidence showed that Williams was intellectually disabled before he turned eighteen." *Id.* at 617. "[T]here is no basis for the Ohio Court of Appeals to have assumed, as it apparently did, that most low childhood IQ scores (or, to be precise, age-fifteen IQ scores) are the result of developmental delays." *Id.* at 618. "[B]ecause intellectual disability manifests itself during childhood and remains static throughout life, evidence of intellectual disability from one point in life is relevant to an examination of intellectual disability in another." *Id.* at 619, citing *State v. White*, 118 Ohio St.3d 12 (2008) and *State v. Lorraine*, 11th Dist. Trumbull No. 2006-T-0100, 2007-Ohio-6724.

{¶10} Second, the Sixth Circuit held that our ruling was "contrary to the established definition of intellectual disability as set forth in clearly established Supreme Court precedent" by categorically excluding "substantial and weighty evidence" from our analysis and ignoring the medical community's determination that intellectual disability manifests before the age of 18. *Id.* at 619, 621. "Importantly, the clinical definitions cited with approval by *Atkins* and adopted by *Lott* do not treat present functioning and early onset as unrelated parts of a disconnected three-part test. To the contrary, a plain reading

of these clinical definitions makes clear that if an individual is indeed *presently intellectually disabled*, as the term is understood, the disability would have manifested itself *before the individual turned eighteen*." *Id.* at 619-620, citing *Heller v. Doe*, 509 U.S. 312, 323 (1993) (intellectual disability "is a permanent, relatively static condition") and *Hall v. Florida,* 572 U.S. 701, 724 (a petitioner must be able to present evidence regarding "deficits in adaptive functioning over his lifetime").

{¶11} Finally, the Sixth Circuit found our decision "applied an arbitrary and disproportionate evidentiary rule to exclude the pre-1989 evidence at issue," thereby abridging Williams' due process right to present evidence. The Sixth Circuit noted that this arbitrary "cutoff" resulted in a categorical exclusion only to evidence that was submitted by Williams. *Id.* at 622-623, citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998) and *Holmes v. S. Carolina*, 547 U.S. 319, 326 (2006) ("the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote").

{¶12} The Sixth Circuit issued a remand order for the district court to grant a writ of habeas corpus prohibiting imposition of the death penalty against Williams, "conditioned upon a fresh analysis by the Ohio courts as to whether Williams is intellectually disabled pursuant to governing law." *Id.* at 624 (citations omitted).

> In remanding, we note that clearly established Federal law, as set forth above, requires courts to consider all relevant evidence bearing on an individual's intellectual functioning and to apply clinical principles of intellectual disability adopted by federal precedent. Indeed, the most recent evidence in the record is well over ten years old, so this could include presentation of new evidence from both Williams and the State relevant to Williams's functioning. But whether to grant an evidentiary hearing after considering all relevant evidence and applying the applicable law is for the state court to decide in the first instance.

*Id.* (internal citations omitted).

{¶13} On remand, the district court ordered the state of Ohio to initiate proceedings in the Trumbull County Court of Common Pleas to reassess Williams' *Atkins* claim in his 2003 petition for postconviction relief, pursuant to the Sixth Circuit's opinion.

{¶14} The trial court held an evidentiary hearing on Williams' *Atkins* claim over multiple days in 2016 and 2017. Ultimately, on April 11, 2019, the trial court issued a 43-page judgment entry, concluding Williams failed to carry his burden under *Atkins* and *Lott*. The trial court concluded:

> Under the first prong, because Defendant's IQ scores were borderline and did not definitively show that Defendant is intellectually disabled, this Court followed the mandate of *Hall* and assessed Defendant's adaptive functioning. This Court has determined that Defendant has not proven that he has significant limitations in adaptive functioning. Finally, under the third prong, Defendant has failed to prove onset before the age of 18. For all the reasons stated above, the Court finds that Petitioner failed to carry his burden.

{¶15} Williams' petition for postconviction relief was again denied. Williams noticed the instant appeal from this denial.

**Subsequent Judicial Precedent**

{¶16} Subsequent to filing his notice of appeal with this court, the Supreme Court of Ohio decided *State v. Ford*, announcing the "*Lott* Test" was outdated. The Court set forth an updated three-part test for intellectual disability ("the *Ford* Test") and held that the rebuttable presumption that a defendant is not intellectually disabled if his or her IQ score is above 70 is no longer valid. *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, ¶100. In reaching this decision, the Ohio Supreme Court analyzed the relatively recent United States Supreme Court decisions of *Hall v. Florida*, 572 U.S. 701 (2014) and *Moore*

*v. Texas*, 581 U.S. ___, 137 S.Ct. 1039 (2017) ("*Moore I*"), which struck down state-court decisions on intellectual disability by applying updated medical diagnostic standards. *Ford*, *supra*, at ¶46-55.

{¶17} Even without the benefit of the *Ford* decision, the trial court relied on the recent United States Supreme Court precedents in concluding that Williams did not meet his burden to prove any part of his *Atkins* claim. Accordingly, we proceed to the merits of Williams' appeal.

**Legal Standards for Assessing Intellectual Disability**

United States Supreme Court

{¶18} In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), the Supreme Court of the United States held that, in light of our "evolving standards of decency," the execution of intellectually disabled individuals violates the Eighth Amendment's ban on cruel and unusual punishments. The Court explained,

> [Intellectually disabled] persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Id.* at 318. The *Atkins* Court also found that intellectually disabled offenders in the aggregate are at "special risk of wrongful execution" due to the possibility of false confessions, difficulty with providing meaningful assistance to counsel and persuasively

8

showing mitigation, and a demeanor that may create an unwarranted impression of lack of remorse. *Id.* at 320-321.

{¶19} Because of disagreement and difficulty in determining which offenders are in fact intellectually disabled, the United States Supreme Court left to the states the task of developing appropriate procedures to enforce this constitutional restriction on capital punishment. *Id.* at 317, citing *Ford v. Wainwright*, 477 U.S. 399, 416-417 (1986).

{¶20} The Court in *Atkins* referred to then current clinical manuals of the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA"). These definitions required (1) significantly subaverage intellectual functioning; (2) significant limitations in two or more adaptive skill areas, such as communication, self-care, and self-direction, etc., and (3) onset before the age of 18. *Atkins*, *supra*, at 308, fn. 3. Thus, while "the States play a critical role in advancing protections and providing the Court with information that contributes to an understanding of how intellectual disability should be measured and assessed, * * * *Atkins* did not give the States unfettered discretion to define the full scope of the constitutional protection." *Hall*, *supra*, at 719.

{¶21} The United States Supreme Court has since applied updated medical diagnostic standards in striking down state-court decisions on intellectual disability: namely, the *Intellectual Disability: Definition, Classification, and Systems of Supports* ("*AAIDD-11*"), a clinical manual published in 2010 by the American Association on Intellectual and Developmental Disabilities ("AAIDD") (f.k.a. the AAMR); and the *Diagnostic and Statistical Manual of Mental Disorders* (5th Ed.2013) ("*DSM-5*") published in 2013 by the APA. *See id.* at 704-705, 713, 722-723.

{¶22} In 2014, the United States Supreme Court declared courts must consider the standard error of measurement ("SEM") when evaluating an offender's IQ score. *Id.* at 722-723. The United States Supreme Court therefore modified *Atkins*' first prong by declaring that, "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* at 723.

{¶23} Each IQ test has a SEM, and the SEM for each test is different. "A test's SEM is a statistical fact, a reflection of the inherent imprecision of the test itself." *Id.* at 713-714 (citations omitted). "An individual's IQ test score on any given exam may fluctuate for a variety of reasons," such as the subject's health, the examiner's demeanor, the practice effect, environment or location, subjective scoring of certain questions, and even guessing. *Id.* at 713, citing the *AAIDD-11* User's Guide (2012). "The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score. For purposes of most IQ tests, the SEM means that an individual's score is best understood as a range of scores on either side of the recorded score [e.g., five points on either side] * * * within which one may say an individual's true IQ score lies." *Id.*

{¶24} The *Hall* Court further explained: "The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework. * * *[This] is of particular help here, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession." *Id.* at 721-722.

{¶25} The next year, applying its decision in *Hall*, the United States Supreme Court found unreasonable a state court's finding that a defendant's IQ score of 75 was inconsistent with subaverage intelligence when, accounting for the SEM, the score was "squarely in the range of potential intellectual disability." *Brumfield v. Cain*, 576 U.S. 305, 314-316 (2015).

{¶26} In 2017, the United States Supreme Court held that, "[i]n determining the significance of adaptive deficits, clinicians look to whether an individual's adaptive performance falls two or more standard deviations below the mean *in any of the three* adaptive skill sets (conceptual, social, and practical)." *Moore I, supra*, at 1046, citing *AAIDD-11* at 43 and *DSM-5* at 33, 38 ("deficits in *only one* of the three adaptive-skills domains suffice to show adaptive deficits") (emphases added). This is a modification of *Atkins*' second prong, which required significant limitations in at least two adaptive skill areas. Two years later, the Supreme Court again emphasized the need for judicial scrutiny of the adaptive behavior prong in accordance with clinical guidelines and recommendations. *Moore v. Texas*, 586 U.S. ___, 139 S.Ct. 666 (2019) ("*Moore II*").

{¶27} Thus, the updated definition of intellectual disability from the United States Supreme Court contains three core elements: (1) "intellectual-functioning deficits (indicated by an IQ score 'approximately two standard deviations below the mean,'—*i.e.*, a score of roughly 70—adjusted for 'the standard error of measurement')," (2) significant adaptive deficits (indicated by "performance that falls two or more standard deviations below the mean") in any of the three adaptive skill set domains (conceptual, social, practical), and (3) the onset of these deficits while still a minor. *Moore I* at 1045-1046, citing *Hall* at 709-710 and *AAIDD-11* at 27, 43, *supra*.

11

{¶28} Applying these updates in *Ford*, the Supreme Court of Ohio held that the *Lott* Test is outdated to the extent it (1) required a finding of significant limitations in two or more adaptive skills and (2) applied a rebuttable presumption that an offender is not intellectually disabled if his or her IQ score is above 70. *Ford, supra*, at ¶97, citing *Lott, supra*, at ¶12. "IQ scores are imprecise and 'should be read not as a single fixed number but as a range.'" *Id.*, quoting *Hall, supra*, at 712.

{¶29} The *Ford* Court further held that a trial court should consider evidence presented on the "Flynn Effect," which is a "'generally recognized phenomenon' in which the average IQ scores produced by any given IQ test tend to rise over time, often by approximately three points per ten years from the date the IQ test is initially standardized." *Id.* at ¶87, quoting *Black v. Carpenter*, 866 F.3d 734, 738, fn. 1 (6th Cir.2017) (internal quotations omitted). The Flynn Effect is distinct from the SEM. *Id.* "The AAIDD recommends that in 'cases in which a test with aging norms is used as part of a diagnosis of [intellectual disability], a corrected Full Scale IQ upward of 3 points per decade for age of the norms is warranted.'" *Id.* at ¶90, quoting *AAIDD-11* at 23. Because it was not discussed in *Hall* or *Moore I*, however, the *Ford* Court held that it is within the trial court's discretion whether to include the Flynn Effect as a factor in the IQ scores. *Id.* at ¶92.

{¶30} The Ohio Supreme Court concluded *Ford* with an updated definition for state courts to apply when determining whether an offender is intellectually disabled for purposes of the death penalty. Courts must consider the following three core elements:

> (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean—i.e., a score of roughly 70 or lower when adjusted for the [SEM]);

12

(2) significant adaptive deficits in any of the three adaptive-skill sets (conceptual, social, and practical); and

(3) the onset of these deficits while the defendant was a minor.

*Id.* at ¶100.

### Standard of Review

{¶31} The procedures for postconviction relief outlined in R.C. 2953.21 et seq. provide the statutory framework for reviewing an *Atkins* claim. The petitioner raising an *Atkins* claim bears the burden of establishing that he or she is intellectually disabled by a preponderance of the evidence. *Lott, supra*, at ¶13, ¶21 (citations omitted).

{¶32} In considering an *Atkins* claim, the trial court shall conduct a de novo review of the evidence in determining whether the petitioner is intellectually disabled. "The trial court may consider expert testimony and appoint experts if necessary in deciding this issue. The trial court shall make written findings and set forth its rationale for finding the defendant intellectually disabled or not intellectually disabled." *Ford, supra*, at ¶100.

{¶33} The trial court's decision on a postconviction *Atkins* claim should be upheld absent an abuse of discretion. A reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence. *State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, ¶45, citing *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶58. "'The term "abuse of discretion" * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Id.* at ¶46, quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980) (citations omitted). It also "connotes that a court's judgment lacks reason or runs contrary to the record." *State v. Benchea*, 11th Dist. Trumbull No. 2015-T-0054, 2016-Ohio-1369, ¶29 (citation omitted). In the context of an *Atkins* claim, "States have some flexibility, but not 'unfettered

discretion.'" *Moore I, supra*, at 1052, quoting *Hall, supra,* at 718. "[T]he medical community's current standards, reflecting improved understanding over time, constrain States' leeway in this area." *Id.* at paragraph (d) of the syllabus. Courts must, therefore, "adequately inform itself of the 'medical community's diagnostic framework.'" *Id.*, quoting *Hall, supra*, at 721.

## Williams' *Atkins* Claim

### School Records

{¶34} Williams' school records show that he was held back in the first grade and the eighth grade. At the age of six he was designated for "educable mentally retarded" classes and continued in special education/adjusted curriculum until the tenth grade. At that point, Williams' was removed from the special education program by his grandmother, and soon after he dropped out of high school. The following is a more detailed, but not exhaustive, summary of Williams' Permanent Record Card:

*First Grade*

{¶35} Williams was required to repeat the first grade. The first time through, at age 6, he received an "F" in Reading, a "D" in Arithmetic, and a "C" in language and writing. He was absent 17 days. His teachers observed his behavior was consistent with a learning disability: distractible, immature, disorganized.

{¶36} The school psychologist administered the Slossen Intelligence Test ("Slossen"), which is not an IQ test, but rather a screening tool used to determine whether further testing was needed. Williams scored 82, which prompted the school psychologist to administer the Stanford-Binet Intelligence Scale two months later. Williams scored 76, which was reported as within the "educable mentally retarded" ("EMR") range of ability.

14

He exhibited good ability in counting objects but was "extremely weak" on any items requiring visual-motor coordination. Williams was also administered the Wide Range Achievement Test ("WRAT"), which showed his fine motor development was at a pre-school level and all other skills were below his grade level. The report described Williams as having poor listening skills, moving constantly, singing to himself, a pleasant child who is hyperactive and distractible. It was recommended Williams join the EMR unit and receive tutoring from upper-grade students. The school psychologist found Williams qualified for the Diagnostic Reading Program, where he continued to experience difficulty.

{¶37} The second time through the first grade, at age 7, he received a "D" in both reading and arithmetic, and "Cs" in language and writing. He was absent 7 days. His conduct was unsatisfactory: distracted, fidgety, disorganized.

*Second and Third Grade*

{¶38} At age 8 and 9, Williams received "Cs" in spelling and reading, which was taught to him at a grade level behind. His other grades, where indicated, were "Ds" and "Fs". He was absent a combined total of 6 days these two years.

*Fourth Grade*

{¶39} At age 10, Williams was placed in the Adjusted Curriculum classes, or "special education," where he remained for the rest of his time in school. He was also assigned an Individual Education Plan ("IEP"), which continued throughout his time in school. Williams received "Cs" in spelling and reading, which were taught to him at the lower grade level; and "Ds" where the other grades were indicated. He was absent less than 5 days.

{¶40}   Williams' teacher requested another psychological evaluation based on his immature and impulsive behavior.  At age 11, the school psychologist administered the Stanford-Binet Intelligence Scale, Form L-M test ("Stanford Binet L-M"), on which Williams scored 78. This placed him within the "adjusted curriculum or slow learner range, which usually includes IQs of between 51 and 80."  He was also administered the WRAT, which noted multiple deficiencies.  It was reported that Williams functioned at a mental age of 8 years, 9 months.

*Fifth Grade*

{¶41}   Williams was taught at the fourth-grade level in all classes and attained "Bs" in science and geography/history; all other grades were "Ds".  His IEP plan goals included being able to "write his name clean."  He was absent 2 days.

*Sixth Grade*

{¶42}   At age 12, Williams transferred to another location in the school system for additional Independent Adjusted Curriculum support.  He was taught at a third-grade level in reading, language, spelling, science, and geography/history; and at a fourth-grade level in arithmetic.  Williams received "Bs" in all his classes except for a "C" in spelling.  He was absent 2 days.

*Seventh Grade*

{¶43}   At age 13, Williams missed 9 days of his first year at the junior high school. He participated in the regular curriculum classes for art, music, and physical education. Williams received a grade of "1" (Below Average) in English, geography, science, math, physical education, and art; "2" (Average) in music; and "3" (Good) in practical arts.  His

IEP identified many learning and academic deficits (e.g., attention span and reading comprehension) as well as emotional challenges (e.g., self-control).

*Eighth Grade*

{¶44}  At age 14, Williams completed the eighth grade for the first time.  He was absent less than 6 days.  He achieved grades of "0" (Unsatisfactory) in history and math; "1" (Below Average) in English, science, and physical education; "2" (Average) in art; "3" (Good) in practical arts; and "4" (Excellent) in music.

{¶45}  At age 15, Williams was required to repeat the eighth grade.  He was absent 9 days.  He received grades of "1" (Below Average) in all classes except for a "2" (Average) in art and "3" (Good) in music and practical arts.  His teachers observed that Williams was disruptive in the classroom and did not socialize appropriately with his classmates.

{¶46}  Williams was administered the standardized Wechsler Intelligence Scale for Children, Revised ("WISC-R"), on which he scored a 67.  His score was reported as within the Developmentally Handicapped range.  He was also administered the standardized Vineland Social Maturity Scale, which is based upon direct observational reports of Williams' teachers.  Williams was assessed at a "social age" of only 9 years, 0 months. He exhibited deficiencies in communication, occupation, locomotion, and self-direction. On a developmental test of visual-motor integration, with a mean of 10 and standard deviation of 3, Williams scored a 2.  This was reported as an age equivalent of 8 years, 7 months.

{¶47}  A "Team Evaluation" conducted by the principal, counselor, psychologist, and developmentally handicapped teacher reported: "At that time the members of the

team determined that [he] continues to qualify for the Developmentally Handicapped Program with the Warren City Schools."

*Ninth Grade*

{¶48} At age 16, Williams was absent 3 days of his first year in the high school. He attended regular classes for art, music, physical education, and practical arts, and developmentally handicapped classes in the remaining subjects. He received grades of "0", "1", and "2".

*Tenth Grade*

{¶49} At age 17, despite recommendations of school officials and the developmentally handicapped team, Williams' grandmother removed him from the Developmentally Handicapped Program at the high school. Williams was placed in the regular curriculum and received "0s" in every subject. He was absent a total of 59 days before dropping out of high school.

<u>Test Scores</u>

{¶50} Williams' intelligence functioning (IQ) test scores are summarized as follows:

| YEAR | AGE | SCORE | TEST | ADMINISTRATOR |
|------|-----|-------|------|---------------|
| 1973 | 6 yrs, 5 mos. | 82 | Slossen (screen) | School psychologist |
| 1973 | 6 yrs, 7 mos. | 76 | Stanford Binet | School psychologist |
| 1978 | 11 yrs., 1 mo. | 78 | Stanford Binet L-M | School psychologist |
| 1983 | 15 yrs., 11 mo. | 67 | WISC-R | School psychologist |
| 2003 | 36 yrs. | 75 | WAIS-III | Dr. Eisenberg |
| 2009 | 43 yrs. | 69 | Stanford Binet-V | Dr. Lecavalier |
| 2016 | 49 yrs. | 68 | WAIS-IV | Dr. Hartung |

{¶51} The four oldest tests were administered when Williams was under the age of 18 and a student in the Warren City School System. In 1973, at the age of 6 years, he scored 82 on the Slossen, a screening test, and two months later scored 76 on the

18

Stanford-Binet Intelligence Scale.  The latter score was reported as an "educable mentally retarded" range of ability.  In 1978, at the age of 11 years, Williams scored 78 on the Stanford-Binet L-M. In 1983, at nearly 16 years of age, Williams scored 67 on the WISC-R.

{¶52}  The three most recent tests were administered by psychologists while Williams was incarcerated.  In 2003, at the age of 36 years, Dr. James Eisenberg, Ph.D., administered the Wechsler Adult Scale of Intelligence (3d Ed.) ("WAIS-III") for purposes of Williams' first *Atkins* petition.  Williams' full scale IQ score was 75, which the court-ordered psychologist reported placed him in the borderline range of intelligence.  Dr. Eisenberg concluded to a reasonable psychological certainty that Williams is significantly impaired in all areas of intellectual functioning, both verbal and nonverbal, but did not meet the criteria of "mentally retarded" under the now-outdated rebuttable presumption in the *Lott* Test.

{¶53}  In 2009, at age 43, Williams scored 69 on the Stanford-Binet Intelligence Scale, Fifth Edition ("Stanford Binet-V"), which was administered by Dr. Luc Lecavalier.

{¶54}  Finally, in 2016, at age 49, Williams' current defense expert administered the Wechsler Adult Intelligence Scale, 4th Edition ("WAIS-IV") for purposes of the evidentiary hearing before the trial court.  Williams' full scale IQ score was 68.

{¶55}  The other three expert witnesses, one for the defense and two for the state, declined to administer a standardized IQ test, citing either a trust in the validity of previously administered tests and/or the "practice effect," which is the accepted theory that one is likely to "learn" and do slightly better on a test that is administered repeatedly.

{¶56}  Williams' adaptive behavior test scores are summarized as follows:

| YEAR | AGE | SCORE | TEST | ADMINISTRATOR |
|---|---|---|---|---|
| 1983 | 15 yrs., 11 mo. | age 9 yrs ("57") | Vineland | School psychologist |
| 2009 | 43 yrs. | 61 | SIB-R | Dr. Lecavalier |
| 2016 | 49 yrs. | 65 | ABAS-3 | Dr. Hartung |
| | | 79 | ABAS-3 | Dr. Dreyer |

{¶57} In 1983, at nearly 16 years of age, the school psychologist administered the standardized Vineland Social Maturity Scale ("Vineland"), based upon direct observational reports of Williams' teachers. The test was not numerically scored, but Williams was assessed at a "social age" of only 9 years, zero months old. At the hearing, a defense expert testified that he calculated Williams' global score to be approximately 57.

{¶58} In 2009, at age 43, Dr. Lecavalier administered the standardized Scales of Independent Behavior-Revised ("SIB-R"), on which Williams scored 61.

{¶59} In 2016, at age 49, Williams was administered the Adaptive Behavior Assessment System, 3rd Edition ("ABAS-3") by his defense expert and by the state's expert. With the former, he scored 65; with the latter, he scored 79.

Expert Witnesses for Williams

*Dr. Thomas Sullivan*

{¶60} Dr. Thomas Sullivan, Ph.D., a member of the APA and a neuropsychologist, was employed by Williams in 2014 to conduct a neuropsychological evaluation in order to rule out any organic brain injury. Dr. Sullivan has testified in over 100 cases, but this was his first *Aktins* case. He performed a clinical evaluation, conducted multiple standardized tests, and reviewed Williams' educational and prison records. His evaluation revealed, inter alia, impaired abstract reasoning and problem-solving skills; illogical statements; and frequent and atypical word substitution errors. Williams showed

20

sufficient performance on the test used to assess for malingering. Dr. Sullivan opined to a reasonable degree of neuropsychological certainty that Williams does not show any evidence of brain damage or injury and that Williams is "mildly mentally retarded."

{¶61} For purposes of his report, Dr. Sullivan relied on the intellectual functioning and adaptive behavior tests administered in 2009-2010 by Dr. Luc Lecavalier, Ph.D., who did not testify at the hearing. Dr. Sullivan felt no need to administer his own tests because he found Dr. Lecavlier's standardized test results were valid, reliable, and consistent with his neuropsychological assessment of Williams.

{¶62} Dr. Lecavalier scored Williams at 69 on the Stanford-Binet-V IQ test. Accounting for the 95% confidence interval, which is similar to the SEM, this scores in the range of 67-75. Dr. Lecavalier scored Williams at 61 on the SIB-R adaptive behavior test, with significant limitations present in the categories of social/communication, personal living skills, and community living. Dr. Lecavalier interviewed Williams about his life before incarceration and also conducted a retrospective assessment of Williams' adaptive behavior by interviewing his cousin, Wanda Vail-Nix, about his adaptive skills before incarceration. She reported Williams could not hold a job, could not cook, and never had a driver's license. Dr. Lecavalier opined to a reasonable degree of psychological certainty that Williams currently meets diagnostic criteria for "mild mental retardation" and that he met that criteria in the period of development.

{¶63} At the evidentiary hearing, Dr. Sullivan calculated Williams' score on the Vineland Social Maturity Scale, administered in 1983, by dividing the months of Williams' social age (108) (referred to as "109" at the hearing) by the months of his chronological age (191) and arrived at a global score of 57.

21

**{¶64}** Dr. Sullivan also testified that the school administered the Stanford Binet L-M, which was created in 1943. Applying the Flynn Effect, he stated the more accurate scores for the 1973 and 1978 IQ tests is 66. Consistent with that assessment is the fact that the school placed Williams in special education classes. Also consistent is the fact that Williams scored a 67 on the 1983 IQ test, which was currently normed.

**{¶65}** He further concluded that Williams met the early onset criteria, referring in part to a 2009 statement from the school psychologist that Williams "continued to be mildly mentally retarded" at age 15.

*Dr. Cynthia Hartung*

**{¶66}** Dr. Cynthia Hartung, Ph.D., is a member of the AAIDD and an associate professor of psychology and clinic director at the University of Wyoming. She was employed by Williams to conduct an *Atkins* assessment. Dr. Hartung has participated in six other *Atkins* cases, making a finding of intellectual disability on behalf of the petitioner in four of them. Dr. Hartung spent approximately five hours with Williams on January 19, 2016, at the Chillicothe Correctional Institution. She conducted a clinical interview, reviewed Williams' educational and prison records, and administered the following standardized tests: WAIS-IV IQ test, ABAS-3 adaptive behavior test, Test of Memory Malingering ("TOMM"), Gray Oral Reading Test–Fifth Edition ("GORT-5"), and Wechsler Individual Achievement Test–Third Edition ("WIAT-III"). Dr. Hartung produced a nine-page report, concluding with a high degree of clinical certainty that Williams has a mild intellectual disability and has been functioning at this level since childhood.

**{¶67}** Dr. Hartung testified to a reasonable degree of psychological certainty that Williams' school records are evidence that he met the age of onset criterion. She reported

it was unclear which version of the Stanford Binet the school administered to Williams in 1973, but testified it was her "best guess" that it was the Stanford-Binet II, which would have been 36 years past norming. She therefore used the Flynn Effect to down-score Williams' score of 76 on that test to an adjusted score of 65. Additionally, Dr. Hartung testified the 1983 test was different than what was administered the first two times, and that an 11-point drop is not statistically significant when considering the SEM, "which can be five or six points in either direction": "it would have to be one and a half standard deviations for it to be considered statistically significant, so it would have to be 21 or 22 points[.]"

{¶68} Williams' scores on the TOMM did not suggest to Dr. Hartung that he was malingering. The results of the GORT-5 indicate a reading ability similar to that of an average 8- to 9-year old. The WIAT-III subtests of individual achievement reflect a reading and spelling ability consistent with his estimated IQ, but that his writing ability is "somewhat stronger than predicted" and "is an adaptive behavior he appears to have developed through practice."

{¶69} Williams obtained a full scale IQ score of 68 on the WAIS-IV IQ test. Considering the 95% "confidence interval," which is similar to the SEM, his true score is in the range of 65 to 73, which falls in the category of Extremely Low to Very Low and places Williams in the mild intellectual disability range. His overall performance was in the 2nd percentile, meaning he scored lower than 96% of individuals his age. She testified that she did not administer the optional subtests because they are only administered if the standard subtests are "spoiled."

23

{¶70} Dr. Hartung administered the ABAS-3, which consists of approximately 300 questions covering the three skill set domains of adaptive behavior, each with their own subtests. Williams earned a global composite score of 65. Each response is scored 0 to 3 to calculate a composite score in each domain and subtest scores in each of the three domains. For reference, subtest scores have a mean of 10 with a standard deviation of 3. Below is a summary of Williams' domain and subtest scores:

| CONCEPTUAL (65) | Communication | 7 |
| | Functional Academics | 1 |
| | Self-Direction | 1 |
| SOCIAL (70) | Leisure | 4 |
| | Social | 4 |
| PRACTICAL (67) | Community Use | 2 |
| | Home Living | 3 |
| | Health & Safety | 1 |
| | Self-Care | 7 |

{¶71} Dr. Hartung administered the test directly to Williams and also to three "informants." Here, the informants were all individuals who knew Williams prior to his incarceration in 1988: two cousins, Wanda Vail-Nix and Cheri Moore, and Williams' ex-girlfriend and mother of his child, Audreana Smith. Their global composite scores were 56, 54, and 53, respectively. Dr. Hartung reported that the scores all indicate Williams' adaptive skills are lower than 99.0 to 99.9% of adults and have been severely limited since childhood. His scores place him in the mild intellectual disability range.

{¶72} At the evidentiary hearing, Dr. Hartung explained that she used the informants because the AAIDD recommends administering the test to multiple people who knew the subject in the general community and because "people with intellectual disabilities, and also children, are not particularly good reporters of their own adaptive functioning and they usually tend to overestimate their own abilities."

24

{¶73} Dr. Hartung acknowledged there are concerns in the field with using the ABAS-3 retrospectively. It is not designed to be used in a prison setting and the test instructions mandate that the informants have frequent, recent, and prolonged contact with the test subject. However, because the interviews were confined to the period of time prior to Williams' incarceration, none of the informants had recent observations to report. Further, because they did not testify at the evidentiary hearing, there is no indication as to how frequent or prolonged their contact with Williams was prior to his incarceration. Dr. Hartung also acknowledged that family and friend informants may have incentive to make the offender appear less capable then he or she really is. She further testified, however, that using the informants can diminish the risk of a retrospective valuation because they can provide "convergent validity," as they did here, where all of the informants' scores were consistent with each other and with Williams' scores, both past and present.

{¶74} Dr. Hartung testified that assessing adaptive behavior within the prison community, as the state's expert did, is an unstandardized administration of the ABAS-3 that does not translate properly. She explained that when you place an intellectually disabled person in a structured setting, such as prison, they function much higher than they would in the general community. Thus, the fact that an individual is functioning better in prison than in the general community actually supports a diagnosis of intellectual disability. For instance, the fact that Williams remembers he needs his medication in the prison does not mean he is capable of remembering to take it every day on his own in the community setting.

25

{¶75} The trial court expressed concern with the ABAS-3 because the two evaluating experts received different scores. The court stated it wanted to review the raw data, including the questions and answers. Dr. Hartung explained to the court that it would be unethical for her to report the raw data in a psychological report because it is not meaningful without converting the data to standard scores. In other words, the trial court would now know how to interpret the raw data.

{¶76} Following the hearing, the trial court ordered Dr. Hartung to produce the raw data of her ABAS-3 testing. Dr. Hartung declined to release the data to the court, citing professional, ethical, and legal constraints.

*Dr. Stephen Greenspan*

{¶77} In a preliminary ruling prior to the hearing, the trial court denied Williams' request to call Dr. Stephen Greenspan, Ph.D., as an expert witness because his testimony "would amount to needless presentation of cumulative evidence." At the hearing, defense counsel proffered Dr. Greenspan's 19-page summary ("Declaration") of the scope and specific issues upon which he would testify if permitted. At the conclusion of the hearing, the trial court again addressed the testimony of Dr. Greenspan, this time excluding it on the basis that he was being called solely as a teaching expert, rather than an evaluating expert.

Lay Witnesses for Williams

*Affidavits of Family Members*

{¶78} With his *Atkins* petition, Williams submitted several affidavits and declarations of family members, including the ABAS-3 informants, who averred to significant intellectual weaknesses evident throughout his life. They all were of the

opinion that Williams was "slow" and unable to perform many tasks other people his age should be able to perform.

{¶79} Wanda Vail-Nix, a cousin of Williams, related the following in her affidavit: she never witnessed Williams doing school work, house work, cooking, or doing laundry; she never heard him have an intelligent conversation with anyone; she never saw him read a book or newspaper or heard him tell a story; Williams did not have a driver's license; he would throw things when he became angry; she heard other family members refer to Williams as "mentally retarded," though she and her siblings thought he was just "extremely bad"; she has never known him to live alone; at age 20, Williams still behaved as if he was 15 years old, performing childlike pranks.

{¶80} Cheri Moore, another cousin of Williams, explained the following in her affidavit: "everyone" knew Williams was "slow," but his grandmother would not allow further testing or provide tutoring; she never saw Williams play board games; Williams colored outside the lines when he was old enough to do better; Williams could not really do any chores, so his grandmother always helped him; his speech and language were "off"; he would write and use words where they did not belong; he did not have a driver's license and could not drive.

{¶81} Teddy Ricks, a second cousin, testified to the following in her affidavit: Williams never seemed "normal" to her; he did not know the rules of kickball; she was embarrassed by Williams because he would "be so dumb about things"; when Williams was sent to the store, he would come back with the wrong items and no change; she could "see his slight retarded-ness in his facial expressions, the way he talked, and held

his lips, and how he talked like a little girl." Ms. Ricks also testified at the evidentiary hearing.

{¶82} Audreana Smith, Williams' ex-girlfriend and the mother of his child, stated the following in an unsworn document, titled "Declaration": she thought Williams was younger than he was when they first met—he was 18 and she was 14—because they were able to converse on the same level; Williams never wrote a love letter or poem; he never called her on the telephone, he only showed up to her house; Williams did not want to drive and was not a good driver; she never saw Williams read a book or newspaper; she did see him look at football magazines but was never sure if he read the articles or just looked at the pictures; she never saw Williams count money or pay a bill when they went out to eat; when he got upset, he would react like a child.

*Rebuttal Witness*

{¶83} In rebuttal to the state's witnesses, Williams also presented testimony of Tyrone Ballew, a fellow death row inmate. Ballew testified that he has been a tutor to Williams, both formally and informally, while incarcerated together for the past approximately 25 years. He approximated that he spent over 100 hours teaching Williams to read, write, and do basic math at Lucasville Correctional Institution. This formal tutoring lasted around two years, and he continued to work with Williams informally when they transferred to other institutions. Ballew testified that when they were incarcerated together at Mansfield Correctional Institution, every death row inmate had to have a job: his job was tutor, and Williams' job was student. Ballew testified that Williams has increased his academic skills, but still receives help with reading and writing, sometimes on the JPAY system.

28

**State's Evidence**

<u>Expert Witness for the State</u>

*Dr. Carla Dreyer*

{¶84} The state countered with the expert report and testimony of Dr. Carla Dreyer, Psy.D., a psychologist with the Court Clinic Forensic Services in Cincinnati. She conducts and supervises evaluations for intellectual disability. Dr. Dreyer was employed by the state to conduct an *Atkins* assessment of Williams. She has consulted on or performed six *Atkins* evaluations. In none of those cases had she found the petitioner intellectually disabled. Dr. Dreyer spent approximately three hours and fifteen minutes with Williams on March 15, 2016, at the Chillicothe Correctional Institution. She conducted a clinical interview; reviewed Williams' educational, court, and prison records; and administered the TOMM and ABAS-3 standardized tests. Dr. Dreyer produced a 31-page report, concluding Williams meets the criteria for Borderline Intellectual Functioning but that he does not meet, and has never met, the criteria for an intellectual disability.

{¶85} She testified that the Slossen, which was administered in 1973, should be reviewed with caution because it is a screening test, but that Williams' score of 82 placed him in the low average range of intellectual functioning. She also noted concern with the score of 67 on the WISC-R and with the results of the Vineland, which were administered in 1983, "because if you look at the other data from the prison and Mr. Williams' own self-report, this testing was completed at a time when he was using alcohol on almost a daily basis and going to, reportedly going to school in an intoxicated state."

{¶86} Dr. Dreyer chose not to administer an IQ test, citing the "practice effect." She did not question Dr. Hartung's decision to not administer the optional subtests on the

WAIS-IV. She did raise a concern, however, because Williams indicated he had previously abused cough and cold medication up to the day before meeting with Dr. Hartung, so Dr. Dreyer was "not sure of how either having or not having that available to him on that day with the testing would have impacted the score." She acknowledged, however, that she had no information to substantiate whether the test results were invalid because Williams may have been high.

{¶87} Dr. Dreyer also administered the ABAS-3 to Williams, the same adaptive behavior test used by Dr. Hartung. She did not administer the test to any informants, however, citing concerns with bias, unreliability of remote memories, and questions relating to the use of technology that was unavailable to Williams prior to his incarceration and that is now unavailable in prison. Dr. Dreyer also testified that roughly one-third of the tasks surveyed in the test are not available to an inmate in a prison setting. As such, she worked with Williams to relate some of the questions to functions actually performed in a prison environment. Dr. Dreyer acknowledged that when Williams was first incarcerated, his grammar was not particularly good, and his handwriting was akin to that of a child younger than the age of 10.

{¶88} Dr. Dreyer scored Williams higher than Dr. Hartung had, with a global composite score of 79. This score, similar to an IQ test, indicates borderline low average functioning. Below is a summary of his domain and subtest scores:

| | | |
|---|---|---|
| CONCEPTUAL (75) | Communication | 8 |
| | Functional Academics | 7 |
| | Self-Direction | 1 |
| SOCIAL (86) | Leisure | 7 |
| | Social | 8 |
| PRACTICAL (82) | Community Use | 7 |
| | Home Living | 7 |
| | Health & Safety | 5 |

30

| | | |
|---|---|---|
| | Self-Care | 9 |

{¶89} Dr. Dreyer testified that, inconsistent with intellectual disability, Williams has impressive knowledge of current events and the procedural history of his court case and uses multiple forms of communication with others. She recognized indications of significant limitations in two adaptive skills—self-direction and health & safety—but it was her opinion that the low scores may have been impacted by a number of variables, including a lack of motivation, impulsiveness, and perceived antisocial personality. She acknowledged that her diagnosis of antisocial personality disorder was not based on any standardized assessment. Dr. Dreyer further testified that an antisocial personality may lower adaptive functioning scores but agreed the clinical consensus is that comorbid disorders do not rule out the possibility of intellectual disability.

{¶90} Dr. Dreyer scored Williams higher in the social domain due to his ability to use the JPAY system and because he keeps a log of his outgoing emails and responses. With respect to the practical domain, Dr. Dreyer testified to Williams' ability to use and retrieve medications; request assistance from an officer for needed repairs in his cell; and obsessive cleanliness. Based on her testing and observations, Dr. Dreyer testified that Williams does not meet the adaptive functioning prong of intellectual disability, as he does not demonstrate significant limitations in two or more adaptive skills as referenced in *Lott*.

{¶91} Dr. Dreyer further opined that there is no proof Williams suffered from intellectual disability as a minor. She found no diagnosis of mental retardation anywhere in Williams' childhood records. Further, she testified that the school's designation of Williams as "educable mentally retarded" and placement in special education courses is evidence of learning difficulties but does not necessarily equate to an intellectual disability

diagnosis. Dr. Dreyer testified that the 1973 and 1978 Stanford-Binet scores of 76 and 78 would not have resulted in a diagnosis of mental retardation, and that the 1978 report states Williams "is one of the higher functioning adjusted curriculum students." She testified that his 1983 WISC-R score of 67 would have placed him in the range of mental retardation but opined that the significant and sudden decline suggested three possible explanations: brain injury, lack of motivation, or alcohol abuse. Dr. Dreyer also questioned the reliability of the 1983 Vineland adaptive functioning test because the informant was unknown, and Williams reported drinking alcohol on a daily basis when he was in high school. Unlike Williams' experts, Dr. Dreyer refused to use the Flynn Effect to down-score any of his earlier IQ scores. She testified that post hoc rescoring is not generally done in clinical practice and, in her experience, use of the Flynn Effect only seems to occur during *Atkins* evaluations.

Court-Appointed Expert Witness

*Dr. Thomas Gazley*

{¶92} Finally, Dr. Thomas Gazley, Ph.D., is a forensic psychologist and former special education teacher. He was appointed by the trial court to conduct an independent *Atkins* assessment of Williams. Dr. Gazley is currently employed at the Forensic Psychiatric Center of Northeast Ohio, performing forensic evaluations for area courts. This case was his fourth *Atkins* assessment.

{¶93} Dr. Gazley spent approximately two and one-half hours with Williams on March 21, 2016, at the Chillicothe Correctional Institution. Dr. Gazley performed a clinical evaluation, which included a conversation about Williams' day-to-day routines at the prison and current events. He submitted a 20-page report to the court. Dr. Gazley's

clinical assessment was that "Overall general intelligence based on language and vocabulary use today is estimated to be within the borderline range. Congruent with this impression is Williams' casual conversation, his attempt to use humor, and his descriptions of how he gets along on death row." Dr. Gazely's informal assessment revealed to him that Williams functions within his schedule; communicates adequately with other inmates and staff; has the ability to make his needs known; compulsively maintains a clean environment; takes care of his hygiene and daily self-care; writes "kites" and commissary lists; uses a dictionary; makes rational conversation; knows of current events; interacts socially; and plays games. At the hearing, he agreed the assessment was speculative and that, while Williams' showed an ability to adapt to life on death row, none of those traits were sophisticated enough to exclude him from being intellectually disabled.

{¶94} He further reported that "adaptive behavior of long term death row inmates is extremely difficult to measure, given the inmate's limited access to the day in and day out activities of the general community population." It is his opinion that any adaptive behavior measures utilized while Williams is in prison provide an "inadequate assessment of adaptive behavior as intended for use in diagnosing mental retardation" because they cannot "be administered in a standardized and reliable manner." Dr. Gazley testified that adaptive skill deficits should be assessed within the community in which the person presently lives but that there are no standardized tests normed for death row. He further noted there are certain adaptive behaviors that serve one well as an inmate on death row but are not needed in the general community, and vice versa.

33

{¶95} Dr. Gazley did not perform any standardized intelligence testing or adaptive functioning testing, citing the "practice effect." He did administer the Wide Range Achievement Test, Fourth Edition ("WRAT-IV"), which measures current academic functioning. The WRAT-IV academic functioning test is scored similar to an IQ test. Williams scored 65 in sentence comprehension, 76 in arithmetic computation, 85 in spelling, 68 in reading composite, and 75 in word reading. Dr. Gazley reported that Williams' scores on the WRAT-IV are better than one might predict given the scores on three out of his last four IQ tests (67, 68, and 69). Dr. Gazley testified that measuring academic achievement is a different process than measuring intellectual functioning because the former does not directly address intellectual potential or cognitive abilities. He further acknowledged that neither the AAIDD nor the APA would rate the WRAT-IV as a standardized IQ test.

{¶96} Dr. Gazley reported that he found no evidence that Williams was diagnosed with mental retardation as a minor or that he was enrolled in community services that would have been available to a minor with that diagnosis. He reported that the school's designation of "educable mentally retarded" was a category of academic placement and did not equate to a diagnosis of "mental retardation." His testimony was that with regard to age of onset, "there needs to be a determination" of intellectual disability or an "established disability" prior to the age of 18. Dr. Gazley also did not use the Flynn Effect to down-score older IQ scores, referring to the practice as controversial in the field.

{¶97} After reviewing all the available data, Dr. Gazley opined with reasonable psychological certainty that Williams has Borderline intellectual functioning and, due to his adaptive behavior allowing adequate functioning within his environment and culture

34

and the fact he was never diagnosed with "mild mental retardation" prior to the age of 18, Williams does not suffer from "mild mental retardation" as defined in *Lott.*

{¶98}  Dr. Gazley also testified that a note Williams wrote to the prison warden to waive his appearance at the evidentiary hearing was more sophisticated than someone with an IQ of 67 or 68 would write.  He testified that Williams has demonstrated the capacity to learn and understand more than one would think given the IQ scores and concluded that Williams' intellectual functioning falls within the borderline range, not intellectually disabled.

{¶99}  Dr. Gazley testified that prior to interviewing Williams and writing his report, he did not use or consult any of the APA's most recent manuals, including the *DSM-5* and the *DSM-IV*, and he had never used the *AAIDD-11*.  He was not familiar with any of the AAIDD's tests.  He acknowledged, however, that these were the basic texts establishing the best clinical practices for assessing intellectual disability.  He further acknowledged that portions of his report dealing with the SEM and confidence intervals were taken from a technical assistance paper that discussed program eligibility and placement of gifted and learning disabled children, not the assessment of intellectual disability.

{¶100} Williams' filed a motion for an order to strike the report and testimony of Dr. Gazley, which the state opposed, and the trial court denied by judgment entry.

<u>Lay Witnesses for the State</u>

{¶101} The state presented testimony of three lay witnesses who have supervised Williams within the prison system.

{¶102} An investigator with Chillicothe Correctional Institution was presented, who explained the JPAY system.  Inmates must set up an account, designate a password,

35

and remember the password. They must also be able to operate their own handheld device—similar to an electronic tablet—plug it into a central kiosk, and log onto the system. The Investigator presented video surveillance of Williams using the JPAY kiosk and copies of emails sent by Williams and received by him from individuals outside the prison. A case worker also testified to the video of Williams using the JPAY kiosk, which shows him typing lengthy correspondence without assistance from any other individuals. The correspondence was introduced, which show vast improvement in sentence structure, spelling, punctuation, typing, and handwriting from the time period Williams was first incarcerated.

{¶103} A Unit Manager at Mansfield Correctional Institution who knew Williams for seven to eight years while employed as a corrections officer on death row was also introduced. He testified that Williams had a typewriter in his cell at that time, and he watched Williams handwrite and type documents without assistance from inmates or staff. He confirmed Williams' self-reported abuse of cold medications for recreational purposes. He did not find Williams gullible or easily led by others and stated Williams always kept himself and his cell neat without assistance. He described Williams as sociable and able to play games and stated he had witnessed Williams reading law books in the prison library.

**Judgment of the Trial Court**

<u>Intellectual Functioning</u>

{¶104} Intellectual functioning is assessed using an individually administered standardized IQ test with current normative data. An offender must demonstrate intellectual functioning deficits by a preponderance of the evidence. This is indicated by

36

an IQ score approximately two standard deviations below the mean—i.e., a score of roughly 70 or lower when adjusted for the SEM. The trial court must also consider any evidence presented as to the Flynn Effect, although it has discretion whether to ultimately apply the deviation to an IQ score.

{¶105} The trial court considered evidence presented on the Flynn Effect but declined to recognize it as a factor with respect to Williams' 1973 Stanford-Binet score of 76 because Dr. Hartung's testimony as to which version was administered was "speculative." The trial court stated, "It is not known with certainty that the Stanford-Binet administered to Williams was a test with outdated norming so as to justify the application of the Flynn Effect."

{¶106} The court made no finding as to Williams' 1978 Stanford-Binet L-M score of 78.

{¶107} Assumably with regard to Williams' 1983 score of 67 on the WISC-R, the trial court mentioned testimony of school representatives, given at the sentencing phase of Williams' trial, that a lack of effort and apathy could have accounted for Williams' decreased scores.

{¶108} The court made no finding as to Williams' 2003 score of 75 on the WAIS-III or his 2010 score of 69 on the Stanford Binet-V.

{¶109} With respect to the WAIS-IV administered by Dr. Hartung in 2016, the trial court noted Dr. Dreyer's testimony that Williams reported to her that he had abused cough and cold medication on the day before meeting with Dr. Hartung. This "raised concerns" with the trial court "about how his substance use could have negatively impacted his test performance at that point." The court further referenced Dr. Dreyer's testimony that she

was concerned about the validity of Williams' test scores in light of his motivations, based on an indication to her that he hoped to "get off on *Atkins*" and then be able to encourage the Court to look at other appellate issues he believed would exonerate him.

{¶110} Based on these findings and observations, the trial court concluded Williams' IQ scores were borderline and did not definitively show that he is intellectually disabled. Thus, the court followed the mandate of *Hall* and *Moore I*, and assessed Williams' adaptive behavior.

<u>Adaptive Behavior</u>

{¶111} Adaptive behavior functioning is assessed in two ways: clinical evaluations and individualized psychometric measures. An offender must demonstrate significant adaptive behavior deficits in any of the three skill set domains: "conceptual," "social," and "practical." These skill set domains are explained in the *DSM-5* at 37:

> The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others.
>
> The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others.
>
> The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others.

The relevant and often-tested subsets of these domains are communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. *Atkins*, *supra*, at 308, fn. 3, citing AAMR and APA guidelines.

{¶112} By definition, intellectually disabled offenders "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318.

{¶113} In *Moore I* and *Moore II*, the United States Supreme Court repeatedly accentuated that when evaluating adaptive behavior, it is error for a court to (1) overemphasize and rely more upon an offender's perceived adaptive strengths as opposed to his adaptive deficits; (2) rely upon an offender's adaptive strengths or improvements developed while in prison; (3) require an offender to prove that certain deficits are related to an intellectual disability rather than a personality disorder or other mental-health issue, as they can exist simultaneously; and (4) relying on factors that do not correspond with clinical definitions of intellectual disability and suggest "lay stereotypes."

{¶114} Here, the trial court questioned whether it could consider the affidavits of Williams' family members, given the United States Supreme Court's caution against relying on lay perceptions of intellectual disability. *Moore I, supra,* at 1052 ("But the medical profession has endeavored to counter lay stereotypes of the intellectually disabled. Those stereotypes, much more than medical and clinical appraisals, should spark skepticism.").

{¶115} The court further noted that while each of the experts agreed that assessing adaptive behavior with a standardized measure while in a prison environment presented a challenge, they disagreed that there was consensus on how to administer the ABAS-3, and each expert evaluated adaptive deficits in different ways.

{¶116} The trial court acknowledged that the AAIDD cautions against assessing adaptive functioning in a prison setting and recommends the ABAS-3 be administered to informants retrospectively—i.e., addressing the subject's adaptive functioning prior to incarceration. The trial court noted general concerns with the ABAS-3, such as: it does not take into account the subject's motivation, or lack thereof; a comorbid diagnosis of personality disorders can have an effect on the results of a self-reporting test; and discrepancies exist in the scoring between evaluators.

{¶117} The court addressed specific concerns it had with Dr. Hartung's administration of the test; to wit: administering the test retrospectively presents issues with memory and bias on the part of the informants, as well as obsolescence of the questions; the inapplicability of some questions to life in prison or cultural background; and the difficulty of assessing the adaptive functioning of an individual who has been in a non-community setting for so many years. The trial court was also of the belief that administering the test to informants was the equivalent of relying on lay opinions, and that *Moore I* viewed the latter with skepticism.

{¶118} The court also addressed specific concerns it had with Dr. Dreyer's administration of the test; to wit: the test is not normed for the prison community, and the AAIDD cautions against assessing adaptive functioning in a prison setting.

{¶119} The court then noted concerns with the admissibility of the ABAS-3 results as applied to these particular proceedings under Evid.R. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). This was due to the lack of consensus regarding whether to and how to conduct the ABAS-3 in this situation; the fact that the ABAS-3 was not designed for forensic proceedings in which the offender is so far

removed from the typical community setting; there is insufficient research regarding the reliability of adaptive behavior instruments when used retrospectively; and the reliability of ratings that are not based on personal observation of typical behavior must be evaluated cautiously.

{¶120} With respect to Dr. Hartung's administration of the ABAS-3, the trial court concluded that without access to her raw data, it could not find she conducted the test in such a way that will yield an accurate result under the standards of Evid.R. 702 and *Daubert*. Specifically, the trial court found: (1) without access to the raw data, it could not confirm that the informants' scores show "convergent validity"; (2) without access to the raw data, it could not determine whether Williams "guessed" on questions related to items that were not available to him at the time he was in the community; and (3) Dr. Hartung's unwillingness to testify [as to the raw data] "bolsters this Court's suspicion that the test results are not reliable and inadmissible in these circumstances."

{¶121} With respect to Dr. Lecavalier's administration of the SIB-R in 2009, the trial court concluded it cannot find the testing meets the standards of Evid.R. 702 and *Daubert* based on Dr. Hartung's testimony that she stopped using the test "because they haven't updated their norms," and "because it appears that Dr. Lecavalier did not administer the SIB-R in accordance with the ethics guidelines that Hartung insists the APA and the AAIDD require—specifically that standardized adaptive testing should not be performed in a prison community."

{¶122} With respect to the school psychologist's administration of the Vineland Social Maturity Scale in 1983, the trial court found it is unclear what the standard score

is, there is no information regarding the informant, and the report does not attest to the validity of the test.

{¶123} In rejecting Williams' contention that *State v. White*, 118 Ohio St.3d 12 (2008) stands for the proposition that the court must credit standardized adaptive functioning measures in spite of the flaws of the test, the trial court distinguished *White* based on the fact that the two testifying experts in that case *agreed* the defendant was intellectually disabled. *See White, supra*, at ¶49-57 (criticizing the trial court's rejection of SIB-R results based on its finding that "a number of flaws" in the test compromised the probative value of the test score, despite the fact that both experts agreed the SIB-R is a valid and well standardized tool for measuring adaptive skills).

{¶124} The trial court concluded that Dr. Gazley's opinion as to adaptive deficits must be afforded more weight even though he did not administer a standardized test, because it was based on his clinical appraisal of Williams rather than lay opinions of informants. The court found, with respect to Dr. Gazley, that "although the AAIDD cautions against assessing adaptive behavior in a structured setting such as a prison, it also states that as a professional responsibility in the diagnosis and assessment of adaptive behavior that a clinician must use direct observations of adaptive behavior."

{¶125} Finally, the trial court found that the "anecdotal evidence" presented in the family members' affidavits was insufficient to establish that Williams exhibits significant limitations in two or more adaptive skills and that some of it "harkens back to the stereotypes that the *Moore* Court condemned."

{¶126} Based on all of the above, the trial court ultimately concluded that Williams did not prove by a preponderance of the evidence that he has significant limitations in two or more adaptive skills under the framework set forth in *Lott*.

Age of Onset

{¶127} An offender must demonstrate the onset of intellectual functioning and adaptive behavior deficits prior to the age of 18 by a preponderance of the evidence. Neither clinical guidelines nor court precedent require an official diagnosis of intellectual disability as a minor in order to meet the "age of onset" criterion. *See, e.g.*, *White*, *supra*, at ¶77-85 (finding the petitioner satisfied the age of onset criterion based solely on academic records).

{¶128} The court declined to follow this court's holding in Williams' previous appeal that he had met his burden with regard to the age of onset because of the difference in Williams' burden on summary judgment (to raise a genuine issue of material fact) as compared to a full evidentiary hearing (to prove by a preponderance of the evidence).

{¶129} Here, the trial court concluded Williams failed to establish onset of intellectual disability as a minor based on multiple findings, a summary of which is as follows:

- Even applying a five-point SEM, only one IQ score out of the three tests administered prior to age 18 places him in the range of intellectual disability, that being the 1983 score of 67 on the WISC-R.

  o *We note that if the Flynn Effect was applied to the earlier Stanford-Binet tests, all three test scores would be in the range of intellectual disability.*

- The 1973 score of 76 on the Stanford-Binet includes a report that Williams had poor listening skills, was moving constantly, and sang to himself during most of the session.

43

- The 1978 score of 78 on the Stanford-Binet is not reliable because the report did not include a statement whether the test results were valid or as to Williams' behavior at the time of the test.

- The 1983 score of 67 on the WISC-R is not reliable because: (1) it was administered when Williams was 16 years old and there was testimony that he was drinking alcohol extensively, even at school, during this period; (2) the report did not contain any specifics as to Williams' efforts at the time or any statement whether the test results were valid; an 11-point drop from the earlier IQ scores could be accounted for by lack of motivation; Williams' petition even argues the 11-point drop is "suspect"; and Williams' scores on the academic achievement test administered by Dr. Gazley are better than one would expect given his most recent IQ scores.

  o *We note that this test was administered when Williams was in eighth grade, and the testimony was that Williams was drinking alcohol extensively towards the end of his school career, which was the tenth grade.*

  o *We also note that Williams' argument that the 11-point drop is "suspect" was for the purpose of arguing ineffective assistance of counsel for failing to pursue the possibility of brain injury during the sentencing phase of his trial.*

- There were some indications of limitations in adaptive functioning as an adolescent, including the Vineland Social Maturity Scale, which assessed Williams with a social age similar to a nine-year-old, with deficiencies in communication, locomotion, occupation, and self-direction.

- Williams was never given a formal diagnosis of mental retardation prior to reaching the age of 18.

- At the time Williams was a student, the requirements for being categorized as "educable mentally retarded" included IQ functioning below 80.


**Assignments of Error**

{¶130} The trial court concluded Williams failed to carry his burden to prove by a preponderance of the evidence any of the three prongs of intellectual disability as defined above. From this judgment, Williams raises five assignments of error for our review:

> [1.] The trial court's conclusion that Williams does not have significantly subaverage intellectual functioning is an abuse of

discretion as it is based upon arbitrary and capricious factual findings.

[2.] The trial court abused its discretion in finding that Williams does not meet the adaptive behavior deficits prong for being intellectually disabled by a preponderance of the evidence.

[3.] The trial court's conclusion that there is insufficient evidence to show by a preponderance of the evidence that symptoms of intellectual disability did not manifest prior to the age of 18 is an abuse of discretion as it is based upon arbitrary and capricious factual findings.

[4.] The trial court abused its discretion in qualifying its own chosen witness, Dr. Thomas Gazley, as an expert for purposes of assessing intellectual disability.

[5.] The trial court abused its discretion when it refused to permit the relevant testimony of Dr. Stephen Greenspan as a teaching expert.

{¶131} An amicus brief was filed in support of Williams by Disability Rights Ohio and The Arc of Ohio. The brief describes Disability Rights Ohio as a not-for-profit organization designated by the Governor of Ohio as the protection and advocacy system under federal law for people in Ohio with disabilities, and The Arc of Ohio as the state affiliate of The Arc of the United States with the mission to advocate for the fundamental moral, civil, and constitutional rights of people with intellectual and developmental disabilities.

{¶132} Williams also provided to this court as supplemental authority the May 20, 2020 decision and judgment of the Sixth Circuit Court of Appeals in *Hill v. Anderson*, 960 F.3d 260 (6th Cir.2020). In *Hill,* the Sixth Circuit held that "the Ohio courts avoided giving serious consideration to past evidence of Hill's intellectual disability. Doing so amounted to an unreasonable determination of the facts and an unreasonable application of even the general *Atkins* standard." *Id.* at 265. The Sixth Circuit instructed the district court to

45

issue a writ of habeas corpus with respect to the inmate's death sentence. *Id.* As of July 15, 2020, however, a majority of the judges of the Sixth Circuit voted for rehearing en banc of the case. Accordingly, the previous decision and judgment of the court was vacated, the mandate was stayed, and the case was restored to the docket as a pending appeal. *Hill v. Anderson*, 964 F.3d 590 (Mem.) (6th Cir.2020).

{¶133} On appeal, Williams generally argues the trial court demanded proof far beyond the legal requirement of a preponderance of the evidence; misapplied the U.S. Supreme Court's precedent of *Atkins*, *Hall*, and *Moore*; made erroneous findings of fact; erred in rulings regarding expert witnesses; and thereby abused its discretion in concluding that Williams proved none of the three criteria for intellectual disability.

**Fifth Assignment of Error – Refusal to Permit Teaching Expert Testimony**

{¶134} Williams' fifth assignment of error challenges the trial court's denial of his motion to allow and admit the testimony of Dr. Stephen Greenspan as cumulative and based on the fact that he was a teaching expert, not an evaluating expert.

{¶135} "Trial courts have broad discretion in determining the admissibility of expert testimony, subject to review for an abuse of discretion." *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, ¶16, citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). "'The term "abuse of discretion" * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *White*, *supra*, at ¶46, quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980) (citations omitted). It also "connotes that a court's judgment lacks reason or runs contrary to the record." *Benchea*, *supra*, at ¶29 (citation omitted). In the context of an *Atkins* claim, "States have some flexibility, but not 'unfettered discretion.'" *Moore I*, *supra*, at 1052, quoting *Hall*, *supra*, at 718. "[T]he

medical community's current standards, reflecting improved understanding over time, constrain States' leeway in this area." *Id.* at paragraph (d) of the syllabus. Courts must, therefore, "adequately inform itself of the 'medical community's diagnostic framework.'" *Id.*, quoting *Hall*, *supra*, at 721.

{¶136} "Under Evid.R. 702(B), an expert witness must be 'qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony.'" *State v. Poling*, 11th Dist. Ashtabula No. 2008-A-0071, 2010-Ohio-1155, ¶40. Although an expert may be qualified and the testimony relevant, it "may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence," i.e., if it is "additional evidence of the same kind to the same point" that would not further assist the trier of fact. Evid.R. 403(B); *Kroger v. Ryan*, 83 Ohio St. 299 (1911), syllabus; *Bostic v. Connor*, 37 Ohio St.3d 144 (1988), paragraph three of the syllabus. Nevertheless, the Supreme Court of Ohio iterates that "Courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met." *State v. Nemeth*, 82 Ohio St.3d 202, 207 (1998), citing *State v. Williams*, 4 Ohio St.3d 53, 57-58 (1983); *Caputo*, *supra,* at ¶26, quoting *Daubert*, *supra*, at 597 (expert testimony should be admitted when "'relevant to the task at hand'" and it "logically advances a material aspect of the proposing party's case").

{¶137} In a preliminary ruling prior to the hearing, the trial court denied Williams' request to call Dr. Greenspan as an expert witness because his testimony "would amount to needless presentation of cumulative evidence." At the hearing, defense counsel proffered Dr. Greenspan's 19-page Declaration of his qualifications and the scope and

47

specific issues upon which he would testify if permitted. The first page of his Declaration states he was "specifically asked **not** to pass judgment on reports or testimony by other experts (either for the defense or the government), and also to **not** explore any aspect of the circumstances surrounding the crime for which Mr. Williams has been convicted." (Emphasis sic.) Rather, he was

> hired as a so-called 'teaching expert,' with the task of informing the court about the nature of intellectual disability, the best practices to be followed in determining if someone has intellectual disability within a forensic setting, and the common misconceptions about intellectual disability which are sometimes held by experts who may lack sufficient training or knowledge about intellectual disability.

The trial court accepted the proffered Declaration for the record but declared it would not consider the document when rendering its decision.

{¶138} At the conclusion of the hearing, the trial court again addressed the testimony of Dr. Greenspan, this time excluding it on the basis that he was being called solely as a teaching expert to educate the trial court judge, who felt he did not need that.

{¶139} Defense counsel informed the trial court that Dr. Greenspan was the most cited authority in the intellectual disability section of the *DSM-5* and had authored four chapters in a book published by the AAIDD, *The Death Penalty and Intellectual Disability* (2014), more than any other contributor. Counsel cited three examples of issues that were contested in the hearing that are arguably determined by AAIDD and APA principles, to which Dr. Greenspan could and would testify: (1) the extent to which adaptive behavior deficits are properly assessed with the prison context, (2) whether evidence of qualifying IQs and adaptive skill deficits should be rejected or discounted because of a comorbid personality disorder, and (3) the application of the Flynn Effect to Williams' IQ test scores

48

from early childhood. The trial court denied reconsideration of its previous ruling and excluded Dr. Greenspan's teaching testimony.

{¶140} On appeal, Williams first argues that the trial court abused its discretion in excluding any and all testimony from Dr. Greenspan because it was not cumulative and was clearly relevant to the trial court's determination as to whether Williams is intellectually disabled, a determination that must be made consistent with the scientific and clinical practices as currently reflected in the AAIDD and the APA. In addition to the three above-stated issues mentioned to the trial court, Williams notes that, perhaps most importantly, Dr. Greenspan would also have testified as to the evolved and currently recognized standards of both the AAIDD and the APA specific to retrospectively assessing intellectual disability. Williams submits that Dr. Greenspan's participation in authoring and addressing both the AAIDD and the APA standards "eminently qualified" him to testify and clarify the court's understanding of whether the competing assessments by the evaluating experts were consistent with those standards.

{¶141} The state responds that the trial court's determination is controlled by the standards "spelled out" in the Supreme Court of Ohio's case law, not by the AAIDD and the APA. This argument, however, glosses over the United States Supreme Court's instruction that, while leaving it to the states to develop procedures for determining whether a defendant is intellectually disabled, a court's determination must be "informed by the medical community's diagnostic framework." *Hall, supra,* at 721-722; *see also Van Tran v. Colson,* 764 F.3d 594, 612 (6th Cir.2014) ("In *Hall,* the Court reasoned that the Constitution requires the courts and legislatures to follow clinical practices in defining intellectual disability."). *Atkins* and its progeny, both federal and state, have consistently

cited to and relied upon the current definitions, standards, and guidelines of the AAIDD and the APA.

{¶142} Further, the state's own statement of the issue in this assignment of error belies its argument that Dr. Greenspan's testimony was cumulative; to wit: "Does a trial court abuse its discretion when it denies a defendant's request for a teaching expert where three other experts had testified in regards to the defendant's intellectual abilities?" Dr. Greenspan was not called to testify as to Williams' specific intellectual functioning; to the contrary, he was called to testify and educate the court as to the AAIDD and APA guidelines and best practices to be followed, and the nature of and common misconceptions about intellectual disability.

{¶143} Williams further argues the trial court abused its discretion because Dr. Greenspan would have been able to address the trial court's apparent concerns and confusion with administration of the ABAS-3 to an inmate and the trial court's suggestion that it was capable itself of assessing whether the ABAS-3 was a reliable and valid standardized test. The state responds that "it is clear that the trial court needed no additional 'aid' in understanding the AAIDD or APA guidelines" because they were cited several times in the court's 43-page opinion and the court noted that it had considered the entirety of these references. We believe this again misses the point of Dr. Greenspan's proffered testimony, which was not to direct the court to those references, but to assist the court with understanding how they are interpreted and applied by experts in the field. The argument is further contradicted by many of the trial court's own statements in the record of the evidentiary hearing.

{¶144} The trial court examined Dr. Hartung at length about her administration of the ABAS-3. The court questioned how the questions answered by the informants were initially scored by hand, how those scored results generate raw scores from various subtests, and how those scores were then interpreted into standard scores. The trial court then asked Dr. Hartung for her raw data. Dr. Hartung informed the court it is unethical to report raw data scores in a psychological report because the raw data scores "wouldn't be meaningful without converting them to standard scores." The court responded, "So if I get this, I'm just going to have some raw data that I won't know what to do with?" Dr. Hartung agreed with that statement but said she could explain it to the court.

{¶145} The court later reiterated that it wanted the raw data "because if I have to base this [decision] on some data, I want to make sure the data is something that I want to base it on." An exchange occurred between the trial court judge, Dr. Hartung, and defense counsel, which indicates the trial court's frustration, confusion, and concerns with the ABAS-3, its standardization and administration, the evaluators' differing scores, and whether the court is "duty bound" to follow Dr. Hartung's ethical constraints with respect to the raw data. The court sensed that many of the questions were "designed to illicit immaturity" and questioned the test's ability to assess intellectual disability. At that point, defense counsel again suggested there was a need for Dr. Greenspan's teaching expert testimony, as he could address the trial court's questions and concerns about the test. The trial court repeated, however, that it did not need that.

{¶146} In further discussion, the trial court indicated it could not make an assessment until he accessed the raw data, stating "there are [some ABAS-3 questions]

51

right now I don't think [are] a very good measure of intellectual disability. I think they have to do with maturity more than anything else and so I may make that call." The court also remarked that the Supreme Court has not even had the raw data on one of these tests to rule on it. The state responded that the AAIDD guidelines do not necessarily control the court in what it considers relevant and valid information and that the standard was set forth in *Lott*. Defense counsel responded that the ABAS-3 *was* a standardized instrument used for assessing intellectual disability.

{¶147} Williams further argues it was an abuse of discretion to refuse to permit Dr. Greenspan to testify on the basis that he was a teaching expert, rather than an evaluating or diagnostic psychologist in the case.

{¶148} There is no requirement in Evid.R. 702 that the expert have personally evaluated or treated the subject about whom the hearing is focused. *See, e.g., Shilling v. Mobile Analytical Serv., Inc.*, 65 Ohio St.3d 252 (1992), syllabus ("A witness who is not a physician, but who qualifies as an expert under Evid.R. 702, may give evidence that would be relevant to diagnosis of a medical condition if the testimony is within the expertise of the witness."). Additionally, "general information" from a psychologist specific to a subject matter that has "been well documented and universally noted in the psychiatric and medical community" may be admissible under Evid.R. 702. *See Nemeth*, *supra*, at 207 (allowing an expert psychologist to testify generally about the *DSM-IV* and battered child syndrome because it would "tend to enhance" the trier of fact's ability to assess the credibility of a child witness); *see also State v. Stowers*, 81 Ohio St.3d 260, 262 (1998) (citation omitted) (a psychological expert's testimony based on "specialized knowledge" is admissible so long as "a person has information which has been acquired

by experience, training or education which would assist the trier of fact in understanding the evidence or a fact in issue and the information is beyond common experience").

{¶149} Further, while factually distinguishable, the Supreme Court of Ohio has recognized the need for and the relevance and admissibility of a teaching expert in the *Atkins* context. In *White*, both the defense and state experts administered the SIB-R to assess the defendant's adaptive behavior skill deficits, and both found the defendant was intellectually disabled. The trial court itself sought out a teaching expert witness, not to evaluate the defendant, but to explain how the SIB-R was developed and how it is used to diagnose intellectual disability. *White*, *supra*, at ¶30. The trial court disregarded the results of both administered tests and found the defendant was not intellectually disabled. *Id.* at ¶34-38. The Supreme Court reversed the lower court based in large part upon the teaching expert's testimony, concluding the record lent no support to the trial court's belief that using the defendant as a self-reporter for the SIB-R compromised the validity of the evaluating experts' diagnosis. *Id.* at ¶49-57.

{¶150} Here, the record indicates that a need existed for the record to include further education and understanding at least with regard to adaptive behavior deficits and the ABAS-3, which was administered by both the defense expert and the state expert. The trial court attempted to remedy this situation by requesting the raw data from the defense expert, who explained it was unethical for her to include it in her report. Although the trial court reversed its decision to require the raw data during the hearing, the trial court later issued a written order for the defense expert to turn over the raw data, which she refused to do. The same order was not issued to the state expert, who had administered the same test. It is apparent the trial court felt more information was

necessary to fully comprehend the administration of the test and the scores Williams received. When it became clear the raw data was inaccessible, the trial court should have then permitted Williams to call the teaching expert to testify and attempt to resolve certain concerns the trial court had, at the very least with regard to the ABAS-3.

{¶151} *Atkins* claims necessarily involve an overwhelming need to educate the factfinder in each case. Clinical guidelines and best practices in the medical and scientific community are not static and are not common nomenclature in a courtroom. The conclusion that Dr. Greenspan's testimony was "cumulative" or "needless" is not demanded by the record, and, when presented with the question of whether capital punishment is cruel and unusual as applied, it would be cavalier for this court to conclude that the probative value of this testimony is substantially outweighed by a concern of it being cumulative. Rendered in the context of federal habeas review of an *Atkins* claim, we note the pronouncement that "'deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" *Brumfield*, *supra*, at 314, quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

{¶152} To conclude, the trial court's decision to exclude the testimony of Dr. Greenspan was an abuse of discretion. This is not to say that a teaching expert is required or necessary in the review of every *Atkins* claim. In this case, based on the potential, and in fact, need for clarification of conflicting conclusions, we cannot say exclusion of this testimony was proper. Here, the record supports a need such that the refusal to permit the testimony amounted to an abuse of discretion.

**Disposition**

54

{¶153} Finding merit with Williams' final assignment of error, the judgment of the Trumbull County Court of Common Pleas is hereby reversed. The matter is remanded for the purpose of permitting the additional testimony of an expert in a teaching capacity. As a result, Williams' first, second, third, and fourth assignments of error are not ripe for review at this time.

{¶154} Additionally, in light of the new standard set forth in *Ford*, and the decisions in *Moore I* and *Moore II*, all of which were decided subsequent to the experts' evaluations and testimony in this matter, the parties are permitted to submit updated evaluations and to supplement the experts' testimony upon request to the trial court. The trial court shall consider Williams' *Atkins* petition, any updated evaluations, and any supplemental testimony of the experts and determine whether Williams is intellectually disabled pursuant to the governing law as set forth in *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539. *See Williams*, 792 F.3d at 624 (instructing the state courts to give this matter "a fresh analysis * * * as to whether Williams is intellectually disabled pursuant to governing law" and "to apply clinical principles of intellectual disability adopted by federal precedent").


MATT LYNCH, J., concurs,

MARY JANE TRAPP, P.J., concurs with a Concurring Opinion.


_____


MARY JANE TRAPP, P.J., concurs with a Concurring Opinion.

{¶155} I concur, but write separately to emphasize that Mr. Williams's *Atkins* petition should be considered in light of the Supreme Court of Ohio's standard set forth in *State v. Ford*, 2019-Ohio-4539, the intervening federal precedents in *Moore I* and *Moore II*, the admonitions of federal precedent in this case, and the state of the evidence.

{¶156} Endeavoring to review the substantive merits of a trial court's determination of intellectual disability reached under an overruled standard by parceling out the court's reasoning to conform it to the new standard in order to analyze that very reasoning would be, quite simply, an illogical exercise. Without the proper procedure, there is nothing substantive for an appellate court to decide. "No court -- not a trial court, not an appellate court, nor even a supreme court -- has the authority, within its discretion, to commit an error of law." *State v. Beechler*, 2nd Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶70. An improper standard is an error of law, and thus, an abuse of discretion.

{¶157} Given the history of this case, and particularly the rebuke from the Sixth Circuit Court of Appeals, we should be scrupulous in sending this case back to the trial court with the mandate to hear the testimony of the excluded expert and consider updated evaluations and supplemented testimony of the experts, who should use the most current standards to ensure a complete review performed using the most current legal and diagnostic standards. *Williams*, 792 F.3d 606, 624 (2015).

{¶158} The evidentiary hearing in this matter was held in 2016 and 2017; *Moore I and Moore II* were released before the trial court's decision issued, but after the evidentiary hearings and expert assessments. *Ford* was just recently released. Thus, no expert in this case had the benefit of the decisions and new standards set forth in *Moore I*, *Moore II*, or *Ford* when performing their evaluations and rendering their opinions.

{¶159} While the trial court attempted to apply *Hall* and *Moore I* within the framework of the *Lott* test, it did not have the full benefit of *Moore II*'s clarifications based upon advancements in the diagnostic standards, and thus, made some conclusions, particularly as to adaptive strengths, not contemplated at the time of *Lott* but recognized by *Ford*. In addition, it appears the state's experts may not have analyzed Mr. Williams' adaptive functioning pursuant to the clinical standards of the American Psychological Association ("APA") and the American Association on Intellectual and Developmental Disabilities ("AAIDD"), which the new *Ford* test implements, and as previously noted, none of the experts had the benefit of *Moore I* and *Moore II.*

{¶160} It is simply not enough that the trial court went beyond the *Lott* rebuttable presumption of a 70 IQ, considered the standard error of measurement, discussed the Flynn effect, and then analyzed Mr. Williams' adaptive functioning and age of onset under *Lott*. The trial court was looking for "significant limitations in two or more adaptive skills," rather than "significant adaptive skill deficits in one or more activities." *Lott* at ¶12; *Ford* at ¶46. Based on *Ford*, the trial court erroneously focused its analysis on Mr. Williams' adaptive functioning in the prison *setting*, his adaptive strengths rather than his adaptive deficits, and did not focus on whether any deficits were presented prior to the age of 18, all of which the United States Supreme Court cautioned against in *Moore II*.

{¶161} As the Supreme Court of Ohio aptly stated in *Ford*, "[t]he concurring-dissenting opinion seeks to tweak *Lott* rather than overrule what is an improper standard for assessing intellectual disability. The opinion says that the evidence reflected the experts' application of the current standards and that any problem with *Lott* was not

57

prejudicial to Ford. * * * *In the context of a capital case, we decline to glean this finding from the record.*" (Emphasis added.) *Id.* at ¶96.

{¶162} In a recent case, *State v. Jackson*, 8th Dist. Cuyahoga No. 108558, 2020-Ohio-4914, the Eighth District reversed and remanded under similar circumstances (albeit *Ford* was released while the case was pending briefing on appeal), explaining: "[w]hen the Ohio Supreme Court decided *Ford*, it did not address the merits of Ford's *Atkins* claim under the *Lott* standard. It recognized that the *Lott* criteria and definitions were outdated and needed to be reevaluated considering recent United States Supreme Court cases and updated diagnostic standards. After it established the new standard for *Atkins* hearings, the Supreme Court remanded the case to the trial court to consider whether Ford was intellectually disabled using the new framework; it did not apply the new standard to the evidence and testimony in the record.

{¶163} "This court's review is for an abuse of discretion, not de novo; accordingly, it would be inappropriate for this court to review the record as a whole and render an opinion utilizing a standard that the trial court did not consider." *Id.* at ¶70 -71.

{¶164} Thus, I concur with the decision to reverse and remand.