[Cite as *State v. Deloney*, 2023-Ohio-1013.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-220433 |
| | | TRIAL NO. B-1303726 |
| Plaintiff-Appellant, | : | |
| | : | *O P I N I O N.* |
| vs. | | |
| | : | |
| JOHN DELONEY, | : | |
| Defendant-Appellee. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 29, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman*, Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Faulkner & Tepe, LLP*, *A. Norman Aubin* and *Richard G. Wendel II*, for Defendant-Appellee.

**BERGERON, Judge.**

{¶1}  Charged with aggravated murder with death penalty specifications, defendant-appellee John Deloney has sat in the Hamilton County Justice Center, waiting for trial, for a decade.  Following a hearing in 2022, the trial court determined that Mr. Deloney is intellectually disabled and thus constitutionally ineligible for the death penalty.  The state appealed, generally asserting that the trial court somehow erred in making this determination.  But the state fails to address, or even mention, any of the findings made by the trial court in its 13-page decision.  For the reasons explained below, the state's appeal is meritless, and we affirm the trial court's judgment.

I.

{¶2}  After a man was shot to death inside his own pizza restaurant, Mr. Deloney was indicted in June 2013 for one count of aggravated murder with death penalty and firearm specifications and one count of aggravated robbery with a firearm specification.  The facts underlying Mr. Deloney's charges are not relevant to our analysis, as the state appeals only the trial court's decision to preclude the death penalty in his case after finding him intellectually disabled.

{¶3}  In December 2013, following the indictment, Mr. Deloney filed a "Motion for Suggestion of Mental Retardation," citing to a psychological evaluation in which he obtained a full-scale IQ score of 63.  In August 2015, the trial court conducted an *Atkins* hearing on the motion during which both sides presented expert testimony and submitted exhibits.  *See Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).  A central theme of this hearing was Mr. Deloney's refusal to cooperate with the experts or his attorneys.  In September 2015, the trial court issued

2

a 22-page entry finding, "by a preponderance of the evidence, that Defendant suffers from intellectual disability. Accordingly, * * * Defendant John Deloney is excluded from facing a possible death sentence herein."

{¶4} The state appealed that decision to this court, and in *State v. Deloney*, 1st Dist. Hamilton No. C-150619, 2017-Ohio-9282, this court reversed the trial court's decision and remanded the cause for further proceedings. We held that the trial court erred in its determination of an intellectual disability under the governing case law of *Atkins*, and *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, because Mr. Deloney failed to establish through expert testimony a sufficient causal link between his intellectual disability and any significant adaptive limitations.

{¶5} A couple of years after our decision, in late 2019, the Ohio Supreme Court issued its decision in *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, which restructured the framework for consideration of an intellectual disability under *Atkins* in Ohio. Both sides agreed that Mr. Deloney's potential intellectual disability needed to be re-examined in light of the new legal standard, and the trial court accordingly convened a second *Atkins* hearing in March 2022. The same experts testified at this second hearing, and Mr. Deloney continued to refuse psychological testing, cooperate with counsel, or cooperate with the experts. But the experts had access to more details about Mr. Deloney's employment history, a deposition taken of his partner, and further information regarding his adulthood academic and intellectual performance, including his records from Cincinnati State Technical and Community College, indicating that he needed to take certain developmental classes before qualifying for admission (which he never took). The experts also had the opportunity to interact with Mr. Deloney over a greater time

period and accounted for the changed legal standard in rendering their analyses at this second hearing.  In August 2022, the trial court found that Mr. Deloney satisfied the new standard set forth in *Ford*, thus rendering him ineligible for the death penalty.

{¶6}    In October 2022, this court granted the state leave to appeal.  In its sole assignment of error, the state asserts that the trial court erred as a matter of law in finding Mr. Deloney to be intellectually disabled.

II.

{¶7}    We must begin our analysis by noting that the state fails, anywhere in its brief, to identify any error committed by the trial court.  In *Ford*, the Ohio Supreme Court required trial courts to make express findings reflective of their analyses.  *Ford* at ¶ 100 ("The trial court shall make written findings and set forth its rationale for finding the defendant intellectually disabled or not intellectually disabled.").  The reason for this directive is to facilitate appellate review in these very serious cases, where a person's life hangs in the balance.

{¶8}    The trial court here followed that mandate, issuing 13 pages of detailed findings assessing the evidentiary record.  The state does not address *any* of those findings in its appellate brief, nor does it address the relevant standard of review, violating various provisions of App.R. 16 and 1st Dist. Loc.R. 16.[1]  *See* App.R. 16(A)(3); 1st Dist. Loc.R. 16.1(A)(4)(c)-(d).

---

[1] As best we can tell, the state merely cut and pasted the analysis it submitted to the trial court for a post-hearing (*pre*-decision) brief into the analysis section of its brief on appeal, which would explain the absence of references to the trial court's decision, the failure to discuss the standard of review, and the like.

{**¶9**}   We accordingly begin where the state's brief should have, with the standard of review.   It is well-established that "[t]he trial court's decision on a postconviction *Atkins* claim should be upheld absent an abuse of discretion." *State v. Williams*, 2021-Ohio-241, 167 N.E.3d 527, ¶ 33 (11th Dist.), citing *State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, ¶ 45.   Because pretrial and postconviction *Atkins* claims are governed by the same authorities, we see no reason to depart from the standard of review for postconviction *Atkins* claims when reviewing a pretrial claim.   And upon being questioned at oral argument, the state agreed with this position.  We therefore review a trial court's decision on a pretrial *Atkins* claim for an abuse of discretion.   And we will not overturn a trial court's findings that are supported by some competent, credible evidence.   *See Williams* at ¶ 33 ("A reviewing court should not overrule the trial court's finding [on an *Atkins* claim] that is supported by competent and credible evidence."); *State v. Hill*, 1st Dist. Hamilton No. C-100554, 2011-Ohio-3920, ¶ 29 ("The determination that a defendant is not * * * mentally retarded will not be disturbed on appeal if it was supported by some competent and credible evidence."); *Deloney*, 1st Dist. Hamilton No. C-150619, 2017-Ohio-9282, at ¶ 29 (Where the court reversed the trial court's decision to grant defendant's *Atkins* motion because it was "not supported by competent, credible evidence.").

{**¶10**}  In *Atkins*, 536 U.S. at 321, 122 S.Ct. 2242, 153 L.Ed.2d 335, the United States Supreme Court held that the execution of intellectually disabled individuals violates the ban on cruel and unusual punishment found in the Eighth Amendment to the United States Constitution.  The Court provided some guidance for determining whether an individual suffers from an intellectual disability, *id.* at 308, fn. 3, but

ultimately it designated "the task of developing appropriate ways to enforce" the *Atkins* holding to the states. *Id*. at 317.

{¶11} Mr. Deloney's first *Atkins* hearing, in 2015, was governed by the standard established by the Ohio Supreme Court in *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011. *Lott* relied on the guidance provided by *Atkins*, and required a finding of: "(1) significantly subaverage intellectual functioning, (2) significant limitations in *two or more* adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18." (Emphasis added.) *Id*. at ¶ 12. *Lott* also held that there is a "rebuttable presumption" that a defendant with an IQ score above 70 is not intellectually disabled. *Id*.

{¶12} In 2019, the Ohio Supreme Court in *Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 100, rejected this approach as outdated, overruling *Lott* and setting forth a new standard for determining whether a defendant suffers from an intellectual disability. The *Ford* test requires a court to consider three core elements: "(1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean—i.e., a score of roughly 70 or lower when adjusted for the standard error of measurement[)], (2) significant adaptive deficits in any of the three adaptive-skill sets (conceptual, social, and practical), and (3) the onset of these deficits while defendant was a minor." *Id*. In making an intellectual disability determination, "[t]he trial court may consider expert testimony and * * * shall make written findings and set forth its rationale for finding the defendant intellectually disabled or not intellectually disabled." *Id*. At the outset, we note that the trial court began its analysis by explaining that defense expert Dr. Smith testified to a reasonable degree of psychological certainty that Mr. Deloney is

6

intellectually disabled under *Ford*, and that prosecution expert Dr. Dreyer was unable to conclude whether he suffered from an intellectual disability due to his refusal to cooperate.

**{¶13}** At the beginning of the March 2022 *Atkins* hearing, the state asserted that it contested all three of the *Ford* criteria. But as the hearing unfolded, it became apparent that the state's only concrete arguments aimed at the second prong. We will nevertheless discuss all three prongs.

**{¶14}** Under the first prong of the *Ford* test, which considers whether the defendant suffers from intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean; or, in other words, a score of roughly 70 or lower when adjusted for the standard error of measurement), the trial court concluded that Mr. Deloney's childhood standardized intelligence tests satisfied this requirement. He achieved a composite IQ score of 63 and a Vineland composite score of 68, confirmed by both Dr. Dreyer and Dr. Smith. His low academic achievement scores remained consistent upon subsequent evaluation at 19 years old. The trial court noted that both Dr. Dreyer and Dr. Smith testified, consistent with the records before the court, that Mr. Deloney was assessed to have extremely low IQ scores. The trial court also found, based on the report of a second defense expert, Dr. Schmidtgoessling, and the testimony of Dr. Smith, that the administered tests were valid and reliable. And the trial court relied on the consensus among the testing psychologists that IQ scores remain stable throughout an individual's life from childhood into adulthood. Therefore, it does not appear disputed that Mr. Deloney satisfied the first part of the *Ford* test.

{¶15} Next, with respect to the second prong of the *Ford* calculus, which requires the court to find that the defendant demonstrates significant deficits in one of three adaptive skillsets (intellectual, social, or practical), the trial court concluded that Mr. Deloney demonstrated significant adaptive deficits in *all three* categories. The court emphasized Mr. Deloney's 1998 Vineland ABS, which is a standardized test that specifically assesses for adaptive deficits. The trial court found that Mr. Deloney's extremely low composite score of 68 demonstrates his significant deficits with respect to various adaptive skillsets. And the trial court referenced Dr. Smith's testimony that Mr. Deloney suffered significant adaptive deficits in all three areas: social, intellectual/conceptual, and practical.

{¶16} With respect to the social realm, the trial court viewed Mr. Deloney's failure to cooperate with his attorneys and with the experts as a reflection of his significant deficits in this domain. And the court observed that Mr. Deloney's paranoia—demonstrated by his motions for new counsel and accusations against his attorneys and the court—reflects significant social deficits in adaptive functioning. The trial court had ample opportunity to observe Mr. Deloney's conduct in this respect over the course of several hearings and court appearances.

{¶17} In determining whether Mr. Deloney suffered from a significant deficit in the intellectual or conceptual domain, the trial court noted that his syntax and semantics are stunted, and his academic records indicate that he received low academic achievement scores and otherwise struggled throughout his academic career: "Deloney's academic record indicates low academic achievement scores and an overall record of academic struggle." The court found that Mr. Deloney reads and writes at about a fifth or sixth grade level. And his placement tests at Cincinnati State,

administered when he was 25 years old, confirm significant ongoing intellectual deficits.

{¶18} As to the practical domain, the trial court found that Mr. Deloney never held any stable job, as he was fired from the only two places he ever worked—at Frisch's and Long John Silver's—after between one and three months. The court emphasized that Mr. Deloney was fired from Long John Silver's for "failure to perform." The trial court also made findings that Mr. Deloney has never had a driver's license, and his partner paid his bills, purchased items for the household, and filed taxes for the household. He also gave his partner power of attorney to manage his finances. Accordingly, copious evidence supported the trial court's determination that Mr. Deloney suffers from significant adaptive deficits in all three domains, satisfying the second prong of *Ford*.

{¶19} Finally, when analyzing the third prong of the *Ford* test—whether the onset of these deficits occurred while the defendant was a minor—the trial court found that Mr. Deloney demonstrated significant subaverage intellectual functioning before he reached the age of 18. To reach this conclusion, the trial court referenced Mr. Deloney's childhood IQ test results—the validity and reliability of which were confirmed by Dr. Smith and Dr. Schmidtgoessling—as well as the continued academic intervention throughout his schooling. The court noted that, in Dr. Schmidtgoessling's report, she also concluded that Mr. Deloney suffered from a "mild intellectual disability" before the age of 18. Moreover, the court found that Mr. Deloney was qualified for special education classes throughout high school and was denied admission to Cincinnati State until he completed certain developmental courses (which, as mentioned earlier, he never took). And the court relied on Dr.

9

Smith's testimony that his review of Mr. Deloney's records and history established the necessary basis to find that he exhibited significant adaptive deficits prior to age 18. It is clear that sufficient evidence supported the trial court's finding that the onset of Mr. Deloney's intellectual deficits occurred when he was a minor.

{¶20} Against this backdrop, the state's brief does not identify any factual findings by the trial court that are not supported by competent, credible evidence. The state's assignment of error indicates that the "trial court erred as a matter of law by finding Deloney intellectually disabled." But its brief contains no argument or analysis to explain how any error "as a matter of law" occurred. Indeed, the trial court here applied the correct legal standard from *Ford* and analyzed the facts in light of that standard.

{¶21} The requirements for precision in identifying and explaining arguments on appeal exist for a reason—a party must explain to us why it believes the trial court erred in order for us to conduct the appropriate analysis. And these rules assume even greater significance in cases like this one, where the Supreme Court mandated that a trial court make particularized findings. Nor is this a case where we can glean the state's position from the substance of its brief. Since it does not address *any* of the trial court's findings, we do not understand how the state believes the trial court abused its discretion or which of the findings it believes lacked evidentiary support. And we do not think it our task to conjure up arguments that the state fails to identify: "An appellate court is not obliged to construct or develop arguments to support [an] assignment of error and 'will not guess at undeveloped claims on appeal.' " *State v. Debose*, 8th Dist. Cuyahoga No. 109531, 2022-Ohio-837, ¶ 16, quoting *State v. Jacinto*,

2020-Ohio-3722, 155 N.E.3d 1056, ¶ 56 (8th Dist.), and *State v. Piatt*, 2020-Ohio-1177, 153 N.E.3d 573, ¶ 39 (9th Dist.).

{¶22} Rather than identifying errors on the part of the trial court, the substance of the state's brief attacks the credibility and reliability of Dr. Smith and advocates instead for reliance on the testimony of Dr. Dreyer. The state expresses concern that Dr. Smith, unlike Dr. Dreyer, is not a forensic psychologist, and that he changed his opinion regarding whether Mr. Deloney is intellectually disabled since the first *Atkins* hearing. But the trial court conducted an exhaustive review of the record, and based its findings on a number of facts, including school records, intelligence tests, basic life skills, the testimony and reports of three experts, and interactions with counsel, experts, and the court. Dr. Smith's testimony was just one of many evidentiary considerations discussed by the trial court in rendering its decision, and notably, his testimony comported with much of the other evidence in the record. The trial court also acknowledged Dr. Dreyer's concessions in support of its conclusion that Mr. Deloney is intellectually disabled—that Mr. Deloney had educational deficits as a child, was consistently tested as below average, and tested in the "extremely low range" on IQ tests and the Vineland Adaptive test. Although the trial court noted that Dr. Dreyer was "unable to express an opinion that Deloney met the requirements of *Ford*," the court did acknowledge that Dr. Dreyer's "testimony and reports [aided] the Court in its understanding of intellectual disability and the difference between a psychological conclusion and a court's finding of intellectual disability." Thus, the record reflects that the trial court utilized the testimony of both experts and does not reveal any sort of unwarranted reliance on Dr. Smith's conclusions.

11

{**¶23**} Moreover, Dr. Smith's qualifications as a psychologist are not contested by the state, and his most recent opinion can be attributed to years of additional interactions with Mr. Deloney as well as the promulgation of the *Ford* standard in the interim between the two *Atkins* hearings. As explained in great detail above, the trial court made the proper and thorough findings under the applicable law based on a variety of sources, and its choice to credit Dr. Smith's testimony fell well within its discretion. *See Pallone v. Pallone*, 10th Dist. Franklin No. 17AP-409, 2017-Ohio-9324, ¶ 26, quoting *Jackson v. Jackson*, 5th Dist. Guernsey No. 03-CA-17, 2004-Ohio-816, ¶ 21, and citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967) (" '[The] court is free to accept or reject, in whole or in part, the testimony or opinions of any witness, whether accepted as an expert or not and determine the weight and credibility to be given thereto.' ").

{**¶24**} Based on our review of the record, the trial court applied the correct law and its findings appear to be both within the exercise of its discretion and supported by the evidentiary record. We certainly have no basis for concluding otherwise in light of the state's failure to point out any deficiencies in the trial court's findings to us.

{**¶25**} During oral argument, the state requested that we create a new legal standard requiring courts to find that *any defendant* who refuses to cooperate in connection with *Atkins* hearing proceedings is not intellectually disabled. But it never developed this argument in its brief, nor did it provide any case law to support it. The bright-line rule it advocates strikes us as incompatible with both *Ford* and earlier Supreme Court authority. *See State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 163-180 (considering, on the merits, the *Atkins* claim of an "uncooperative" defendant who alleged that he suffered from an intellectual

12

disability).  The *Ford* test requires the trial court to make findings, and in many cases, if a defendant refuses to cooperate, that might doom his effort to avail himself of *Ford.* Given the state's failure to develop this argument in its brief and its failure to identify any authority supporting it, we reject the invitation to create a novel rule of law from whole cloth.

\*    \*    \*

{¶26}   In light of the foregoing analysis, we overrule the state's sole assignment of error and affirm the trial court's judgment.

Judgment affirmed.

**CROUSE, P.J.,** and **BOCK, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.